# UNITED STATES DISTRICT COURT

## DISTRICT OF MARYLAND

| | |
|---|---|
| SHANE ROTHENBERGER, derivatively on behalf of MEDIFAST, INC., | Civil Action No. |
| Plaintiff, | |
| v. | |
| BRADLEY T. MACDONALD, MARGARET MACDONALD–SHEETZ, DONALD F. REILLY, MICHAEL S. MCDEVITT, MICHAEL C. MACDONALD, GEORGE LAVIN, JR., CHARLES P. CONNOLLY, BARRY B. BONDROFF, JEANNETTE M. MILLS, JASON L. GROVES, SR., CATHY T. MAGUIRE, JOHN P. MCDANIEL, JERRY D. REECE, H.C. BARNUM, JR., and BRENDAN N. CONNORS, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| MEDIFAST, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.      Plaintiff Shane Rothenberger ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Medifast, Inc. ("Medifast" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from March 4, 2010 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.      According to its public filings, Medifast engages in the production, distribution, and sale of weight management and disease management products, and other consumable health

and diet products in the United States. The Company's product lines include weight and disease management, meal replacement, and vitamins. It also operates weight control centers that offer Medifast programs for weight loss and maintenance, customized patient counseling, and Inbody composition analysis.

3.      Throughout the Relevant Period, defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operation, and prospects. Specifically, defendants made false and/or misleading statement and/or failed to disclose: (1) that defendants were improperly recognizing certain expenses; (2) that the Company lacked adequate internal and financial controls; and (3) that, as a result of the foregoing, the Company's financial results were materially false and misleading at all relevant times.

4.      On March 11, 2011, defendants caused the Company to disclose that it would be forced to delay filing its fiscal 2010 financial results and its Annual Report on Form 10-K. According to the very limited information provided by defendants regarding the delay, Medifast required additional time to complete its year-end financial statements due to the need to review the recognition of certain expenses in prior periods.

5.      On this news, Medifast shares declined $5.27 per share, or more than 24%, to close at $16.63 per share on March 11, 2011.

6.      On April 1, 2011, in a Form 8-K, defendants caused the Company to announce that in response to the above review, the Company would be required to restate its financial results. Additionally, defendants admitted that the Company's internal controls during the Relevant Period contained material weaknesses. The April 1, 2011 Form 8-K specifically stated, in relevant part:

The Item 4.02 disclosure below relates to the restatement of our financial statements for the years December 31, 2008 and 2009 and beginning retained earnings as of January 1, 2008 principally due to errors in recording certain ordinary course of business expenses in the proper period. Certain costs and expenses affecting selling, general and administrative expenses and cost of sales, to include shipping expenses and certain web advertising expenses, which due to growth and evolution in the business model were consistently expensed in the following month after services were rendered, rather than being accrued in the proper period. The company has consistently recorded twelve months of expenses in each year. In addition to the timing of expenses, there was a write off related to an intangible asset. Also, in the Medifast Weight Control Centers, the Company had been recording program fees on a cash basis for customers who paid up front. The difference has been deferred and properly recorded over the applicable service period, and for fiscal year 2010 has been properly recorded, so there is no material impact for the year ended December 31, 2010.  With the Company's accelerated growth rate over the last few years (44% CAGR in sales since December 31, 2007) the one month lag in expenses on a cumulative basis was deemed material per Staff Accounting Bulletin No. 108 and requires restatement for the years ended December 31, 2008 and 2009. The Item 4.02 disclosure is as follows:

In the course of our 2010 annual audit by our independent registered public accounting firm McGladrey & Pullen, LLP's (McGladrey), McGladrey requested in March 2011 that we re-evaluate whether our historical and then current practices with the respect to the timing for recognition of certain expenses were appropriate under generally accepted accounting principles in the United States ("GAAP"). This required the company to request an automatic extension for filing our 10-K to allow adequate investigative time for the reevaluation and to allow our current year auditor to meet, discuss and review work papers with our prior years' auditors who then concurred with the conclusory recommendation to restate for prior years made following their joint review.

*       *       *

Management performed a detailed review of expense recognition of certain ordinary course of business expenses for the year's 2008 and 2009. *As a result, we identified a material weakness in our internal control over financial reporting.* Historically, our accounts payable and accrued expense accounts were evaluated on a quarterly and annual basis based upon whether the corresponding expenses were fairly stated (*e.g.* by analyzing whether our operating results included twelve months of expenses for the yearly periods or three months of expenses for the quarterly periods) which they did.. However, our procedures did not include a detailed review of ending liability balances for these specific costs and expenses, which resulted in certain expenses being recorded when they were paid rather than incurred.  In addition, during the course of their audit, McGladrey identified other adjustments pertaining to the prior years which have also been included in the restatement. Our predecessor auditor concurred with management's assessment and has audited the restatement adjustments.

***On March 28, 2011 management and the Audit Committee reviewed management's findings and the Audit Committee concluded that restating the consolidated financial statements for the years ended December 31,2008 and 2009 is required.*** The effects of these restatements are included in this Annual Report on Form 10-K for the fiscal year ended December 31, 2010. The

Company has determined that previously reported amounts in our 2010 quarterly filings on Form 10-Q need not be restated due to the immaterial effect on 2010 revenues, operating income, pre-tax income, net income or cash flows for the quarterly periods presented.

The correction of the errors noted in (i) above reduced 2009 and 2008, net income by $606,000 ($.04 per diluted share), $523,000 ($.04 per diluted share), and $628,000 was adjusted to beginning retained earnings as of January 1, 2008.

7.      Accordingly, as a result of Defendants' breaches, the Company has been damaged.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

9.      Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

10.      Plaintiff is a current shareholder of Medifast and has continuously held Medifast stock at all relevant times.  Plaintiff is a citizen of California.

11.      Nominal defendant Medifast is a Delaware corporation, with its principal executive offices at 11445 Cronhill Drive, Owings Mills, Maryland 21117.  According to its public filings, Medifast combines physician supervised weight loss programs with nutritional

- 4 -

supplements and multidisciplinary patient education programs. The Company provides an Internet-based physician and medical practitioner network to consumers. Medifast also provides a corporate wellness program for large corporations, associations, and their health insurance carriers.

12.     Defendant Bradley T. MacDonald ("B.T. MacDonald") has served as the Company's Executive Chairman of the Board since January 1998 and was also the Company's Chief Executive Officer ("CEO") until March 2007. Defendant B.T. MacDonald is the father of defendant Margaret E. MacDonald-Sheetz and brother of defendant Michael C. MacDonald ("M.C. MacDonald"). Upon information and belief, defendant B.T. MacDonald is a citizen of Maryland.

13.     Defendant Margaret MacDonald–Sheetz ("MacDonald–Sheetz") has served as the Company's President and Chief Operating Officer ("COO") since March 2007 and as a director of the Company since 2005. Defendant MacDonald-Sheetz is the daughter of Defendant B.T. MacDonald and niece of defendant M.C. MacDonald. Upon information and belief, defendant B.T. MacDonald is a citizen of Maryland.

14.     Defendant Donald F. Reilly ("Reilly") has served as a director of the Company since 1998. Upon information and belief, defendant Reilly is a citizen of Pennsylvania.

15.     Defendant Michael S. McDevitt ("McDevitt") has served as the Company's CEO and a director of the Company since March 2007. Between March 2005 and March 2007, defendant McDevitt served as the Company's President. Between January of 2006 and May 13, 2010, he served as the Company's Chief Financial Officer ("CFO"). Upon information and belief, defendant McDevitt is a citizen of Maryland.

16.     Defendant M.C. MacDonald has served as a director of the Company since 1998.

Defendant M.C. MacDonald is the brother of defendant B.T. MacDonald and uncle of defendant MacDonald–Sheetz.  Upon information and belief, defendant M.C. MacDonald is a citizen of Connecticut.

17.     Defendant George Lavin, Jr. ("Lavin") has served as a director of the Company since 2005.  In addition, defendant Lavin has served as a member of the Board's Audit Committee (the "Audit Committee") during the Relevant Period.  Upon information and belief, defendant Lavin is a citizen of Pennsylvania.

18.     Defendant Charles P. Connolly ("Connolly") has served as a director of the Company since 2006.  In addition, defendant Connolly has served as the Chairman of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Connolly is a citizen of Pennsylvania.

19.     Defendant Barry B. Bondroff ("Bondroff") has served as a director of the Company since 2008.  In addition, defendant Bondroff has served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Bondroff is a citizen of Maryland.

20.     Defendant Jeannette M. Mills ("Mills") has served as a director of the Company since 2008.  Upon information and belief, defendant Mills is a citizen of Maryland.

21.     Defendant Jason L. Groves, Sr. ("Groves") has served as a director of the Company since 2009.  In addition, defendant Groves has served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Groves is a citizen of Washington D.C.

22.     Defendant Cathy T. Maguire ("Maguire") has served as a director of the Company since 2009.  Upon information and belief, defendant Maguire is a citizen of

Pennsylvania.

23.     Defendant John P. McDaniel ("McDaniel") has served as a director of the Company since 2009.   Upon information and belief, defendant McDaniel is a citizen of Maryland.

24.     Defendant Jerry D. Reece ("Reece") has served as a director of the Company since 2009.  Upon information and belief, defendant Reece is a citizen of Kansas.

25.     Defendant H.C. "Barney" Barnum, Jr. ("Barnum") has served as a director of the Company since 2009.  Upon information and belief, defendant Barnum is a citizen of Maryland.

26.     Defendant Brendan N. Connors ("Connors") has been the Company's CFO since May 2010.  Upon information and belief, defendant Connors is a citizen of Maryland.

27.     Collectively, defendants B.T. MacDonald, MacDonald–Sheetz, Reilly, McDevitt, M.C. MacDonald, Lavin, Connolly, Bondroff, Mills, Groves, Maguire, McDaniel, Reece, Barnum, and Connors shall be referred to herein as "Defendants."

28.     Collectively, defendants Lavin, Connolly, Bondroff, and Groves shall be referred to as the "Audit Committee Defendants."

## DEFENDANTS' DUTIES

29.     By reason of their positions as officers, directors, and/or fiduciaries of Medifast and because of their ability to control the business and corporate affairs of Medifast, Defendants owed Medifast and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Medifast in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Medifast and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes

- 7 -

to Medifast and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

30.    Defendants, because of their positions of control and authority as directors and/or officers of Medifast, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Medifast, each of the Defendants had knowledge of material non-public information regarding the Company.

31.    To discharge their duties, the officers and directors of Medifast were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Medifast were required to, among other things:

      a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

      b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

      c.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

32.    Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to:

      a.  Review with the management the quality and adequacy of internal controls that could significantly affect the Company's financial statements;

      b.  Review at least quarterly with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's

compliance with legal or regulatory requirements, or the performance of the internal audit function;

c. Discuss with management the Company's major financial risk exposures, the Company's policies with respect to risk assessment and risk management, and the steps management has taken to monitor and control these exposures;

d. Discuss with management the quality and adequacy of the Company's disclosure controls and procedures;

e. Prior to each quarterly earnings release, discuss with management the earnings press release, financial information and earnings guidance to be provided to investors, analysts or rating agencies;

f. Meet to review and discuss with management the Company's quarterly and annual financial statements; and

g. Review with the Company's General Counsel legal matters that may have a material impact on the financial statements, the Company's compliance policies and any material reports or inquiries received from regulators or government agencies.

## SUBSTANTIVE ALLEGATIONS

**A.**   **Company Background**

33.    According to its public filings, the Company is engaged in the production, distribution, and sale of weight management and disease management products and other consumable health and diet products. The Company's product lines include weight and disease management, meal replacement, and vitamins primarily manufactured in its FDA approved facility in Owings Mills, Maryland. The Company's operations are primarily conducted through five of its wholly owned subsidiaries, Jason Pharmaceuticals, Inc., TSFL, Jason Enterprises, Inc., Jason Properties, LLC and Seven Crondall, LLC. The Company's three primary distribution channels are TSFL, Direct Response, and Medifast Weight Control Centers.

**B.**   **Defendants' False and Misleading Statements**

34.    On March 4, 2010, Defendants caused the Company to issue a press release

announcing its financial results for the fourth quarter and year ended December 31, 2009. For the fourth quarter, Defendants caused the Company to report a net income of $3 million, or $0.21 per diluted share and revenue of $46.2 million, as compared to net income of $949,000, or $0.07 per share and revenue of $25.5 million for the same period of the prior year. For the year 2009, Defendants caused the Company to report a net income of $12 million, or $0.81 per diluted share and revenue of $165.6 million, as compared to a net income of $5.4 million, or $0.38 per diluted share and revenue of $105.4 million for the same period of the prior year.

35.     Regarding the results, defendant McDevitt commented the following:

> As we indicated in our preliminary results release, we are extremely pleased that our multi-platform distribution business model continued to operate at a high level during the fourth quarter of 2009. The traditional holiday seasonality that is inherent to our calendar fourth quarter did not materialize this year and we benefitted with strong growth from all of our distribution channels. The credibility of the Medifast line of products and our weight loss program is enhanced by virtue of the recommendation of more than 20,000 doctors, and is a key factor to our success. In today's environment, we believe that the recommendations of friends and family as well as those in the medical profession transcend the mass market advertising paradigm as the most effective way to communicate the message and benefits of a weight loss program.

36.     On March 31, 2010, Defendants caused the Company to file its annual report on Form 10-K for the year ended December 31, 2009 with the SEC, which was signed by defendants B.T. MacDonald, MacDonald–Sheetz, Reilly, McDevitt, M.C. MacDonald, Lavin, Connolly, Bondroff, Mills, Groves, Maguire, McDaniel, and Reece and represented the Company's 2009 financial results and financial position. In addition, pursuant to the Sarbanes-Oxley Act of 2002, the Form 10-K contained signed certifications ("SOX Certifications") by defendant McDevitt, stating that the financial information contained in the 10-K was accurate, and that any material changes to the Company's internal control over financial reporting were disclosed.

37.    On May 5, 2010, Defendants caused the Company to issue a press release announcing its financial results for the first quarter ended March 31, 2010.  Defendants reported a net income of $4.9 million, or $0.33 per diluted share and revenue of $60.6 million, as compared to a net income of $2.5 million, or $0.17 per share and revenue of $34.6 million for the same period of the prior year.

38.    Regarding the results, defendant McDevitt commented the following:

> We continue to experience very strong growth in each of our multiplatform distribution channels. Increasingly the Take Shape for Life, Direct Response, and Medifast Weight Control Center channels are providing a complimentary source of support for health coaches and clients to connect and share Medifast's clinically proven weight-loss programs. We will expand our platform by strategically investing in our infrastructure and enhancing our message to reach more consumers in both new and existing markets in the future. We believe our vertically integrated operations and increased capacity allow us to continually improve the long-term leverage of our business model by expanding our margins and long-term profitable growth. We look forward to building upon the record achievements during the first quarter in 2010.

39.    On May 10, 2010, Defendants caused the Company to file a quarterly report on Form 10-Q for the first quarter ended March 31, 2010 with the SEC, which was signed by defendant McDevitt, and represented the Company's quarterly financial results and financial position.  In addition, the Form 10-Q contained SOX Certifications by defendant McDevitt, stating that the financial information contained in the 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting were disclosed.

40.    On August 5, 2010, Defendants caused Medifast to issue a press release announcing its financial results for the second quarter ended June 30, 2010.  Defendants reported net income of $5.6 million, or $0.38 per diluted share and revenue of $66.7 million, as compared to net income of $3.0 million, or $0.20 per diluted share and revenue of $41.7 million for the same period of the prior year.

41.   Regarding these results, defendant McDevitt commented the following:

> We are extremely pleased with Medifast's strong second quarter revenue and earnings performance. Our multi-platform distribution channels continue to provide a complementary source of support for Medifast direct response, weight loss clinics and health coaches to connect with clients in ways they prefer and share Medifast's clinically proven weight-loss programs. We started the second half of the year with a 62% increase in attendance at the Take Shape for Life Annual Convention; and we believe this combined with the addition of at least 11 new Medifast Weight Control Centers, and a strong, efficient investment in Direct Response advertising provides strong momentum for the second half of 2010. Going forward, we are confident that our vertically integrated operations and increased capacity will allow us to continually improve the long-term leverage of our business model by expanding our margins and future long term profitable growth.

42.   On August 09, 2010, Defendants caused the Company to file a quarterly report on Form 10-Q for the second quarter ended June 30, 2010 with the SEC, which was signed by defendants McDevitt and Connors, and confirmed the Company's quarterly financial results and financial position.   In addition, the Form 10-Q contained SOX Certifications by defendants McDevitt and Connors, stating that the financial information contained in the 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting were disclosed.

43.   On November 4, 2010, Defendants caused Medifast to issue a press release announcing its financial results for the third quarter ended September 30, 2010.   Defendants reported a net income of $5.8 million, or $0.39 per diluted share and net revenue of $67.3 million for the third quarter 2009, compared to a net income of $3.4 million, or $0.23 per diluted share and net revenue of $46.1 million for the same period of the prior year.

44.   Regarding these results, defendant McDevitt commented the following:

> Our positive sales results were broad-based with each of our distribution channels growing at a rate of at least 30%. Increasingly, the Take Shape for Life, Direct Response, and Medifast Weight Control Center sales channels provide a complimentary source of personalized support for clients to

connect and share Medifast's clinically proven weight-loss program. We are extremely pleased with our financial performance to date. Going forward, we are confident that our vertically integrated operations, combined with our recent investments in infrastructure and personnel will allow us to continually improve the leverage of our business model as we increase sales and expand margins for long-term profitable growth.

45.    On November 9, 2010, Defendants caused the Company to file with the SEC a quarterly report on Form 10-Q for the third quarter ended September 30, 2010, which was signed by defendants McDevitt and Connors, and confirmed the Company's previously reported quarterly financial result.   In addition, the Form 10-Q contained SOX Certifications by defendants McDevitt and Connors, stating that the financial information contained in the 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting were disclosed.

46.    On September 3, 2010, Defendants caused the Company to disclose in a Form 8-K filed with the SEC that it had restated consolidated financial statements for 2006 through 2008 due to errors in deferred tax accounts.   Specifically, Defendants caused the Company to disclose the following in relevant part:

(a) During the audit of the Company's financial statement for the year ended December 31, 2009, Management of Medifast, Inc. was first advised by Friedman, LLP, the Company's independent registered public accounting firm, that a potential error existed in its deferred tax account balances due to timing differences resulting between depreciation expense for tax purposes versus financial statement purposes.

Management performed a detailed reconciliation of deferred tax accounts and the related provision for income taxes for all tax years beginning in 2001 in order to quantify the potential balance adjustments. The Company's Management upon being advised by its Independent Auditor of the SF AS No. 109 calculation issue, as part of its Sarbanes Oxley policy regarding internal controls regarding financial reporting, immediately reported this issue to the Audit Committee which promptly initiated and conducted its review. That review on March 16, 2010 concluded i) that Bagell, Josephs, Levine & Company, LLP ("BJL") had merged with Friedman, LLP effective January 1, 2010. ii) that neither Management nor the Audit Committee had been previously

notified of this audit concern by its auditors BJL either during those audits nor while preparing the quarterly reports and tax returns with BJL Tax Accountant Services for the pertinent years iii.) that Company management is responsible for the internal controls over the preparation and review process for the calculation of the income tax provision which was inadequate, and led to errors in the computation of deferred tax assets, deferred tax liabilities, and related income tax provision.

On March 29, 2010 management and the Audit Committee reviewed management's findings as well as the finding of Friedman, LLP and the Audit Committee concluded that restating the consolidated financial statements for the years ended December 31, 2006, 2007, and 2008 is required. The Company announces that its consolidated financial statements for the years ended December 31, 2006, 2007 and 2008 issued prior to the filing of its Annual Report on Form 10-K on March 31, 2010, should not be relied upon henceforward.

The Company is restating for errors identified in its deferred tax accounts pertaining to (i) differences between the income tax basis and the financial reporting basis of long-lived assets that were not reconciled to the deferred tax balances (ii) to properly apply a net operating loss to our deferred tax and provision for income taxes for the years ended December 31, 2001, 2002, 2003, 2004, and 2005. The effects of these restatements are included in the Annual Report on Form 10-K for the fiscal year ended December 31, 2009 filed on March 31, 2010 with the Securities and Exchange Commission. The Annual Report on Form 10-K filed on March 31, 2010 also includes management's conclusion that a material weakness existed in our internal control over financial reporting as of December 31, 2009. The preparation and review process for the calculation of the tax provision was inadequate, which led to errors in the computation of deferred tax assets, deferred tax liabilities, and related income tax provision.

The correction of the errors noted in (i) above reduced 2008, 2007, and 2006 net income by $601,000 (.04 per diluted share), $411,000 ($.03 per diluted share), and $583,000 (.04 per diluted share), respectively. The corrections noted in number (ii) above increased beginning of 2006 accumulated deficit by $1,358,000.

47.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts: (1) that Defendants were improperly recognizing certain expenses; (2) that the Company lacked adequate internal and financial controls; and (3) that, as a result of the foregoing, the Company's financial results were materially false and misleading at all relevant times.

**C.**      **The Truth Begins To Emerge**

48.      On March 11, 2011, Defendants caused the Company to disclose that it will require additional time to review its year-end financial statements. Specifically, the "delay in releasing is due to additional time needed for the Company to review the recognition of certain expenses in prior periods, and, therefore, complete its consolidated financial statements for fiscal 2010 and its Annual Report on Form 10-K."

49.      On this news, Medifast shares plummeted $5.27 per share, or more than 24%, to close at $16.63 per share.

50.      On April 1, 2011, in a Form 8-K, Defendants caused the Company to announce that in response to the above review, the Company would be required to restate its financial results. Additionally, Defendants admitted that the Company's internal controls during the Relevant Period contained material weaknesses. The April 1, 2011 Form 8-K specifically stated, in relevant part:

> The Item 4.02 disclosure below relates to the restatement of our financial statements for the years December 31, 2008 and 2009 and beginning retained earnings as of January 1, 2008 principally due to errors in recording certain ordinary course of business expenses in the proper period. Certain costs and expenses affecting selling, general and administrative expenses and cost of sales, to include shipping expenses and certain web advertising expenses, which due to growth and evolution in the business model were consistently expensed in the following month after services were rendered, rather than being accrued in the proper period. The company has consistently recorded twelve months of expenses in each year. In addition to the timing of expenses, there was a write off related to an intangible asset. Also, in the Medifast Weight Control Centers, the Company had been recording program fees on a cash basis for customers who paid up front. The difference has been deferred and properly recorded over the applicable service period, and for fiscal year 2010 has been properly recorded, so there is no material impact for the year ended December 31, 2010. With the Company's accelerated growth rate over the last few years (44% CAGR in sales since December 31, 2007) the one month lag in expenses on a cumulative basis was deemed material per Staff Accounting Bulletin No. 108 and requires restatement for the years ended December 31, 2008 and 2009. The Item 4.02 disclosure is as follows:
>
> In the course of our 2010 annual audit by our independent registered public accounting firm McGladrey & Pullen, LLP's (McGladrey), McGladrey requested in March 2011 that we re-evaluate whether our historical and then current

- 15 -

practices with the respect to the timing for recognition of certain expenses were appropriate under generally accepted accounting principles in the United States ("GAAP"). This required the company to request an automatic extension for filing our 10-K to allow adequate investigative time for the reevaluation and to allow our current year auditor to meet, discuss and review work papers with our prior years' auditors who then concurred with the conclusory recommendation to restate for prior years made following their joint review.

*       *       *

Management performed a detailed review of expense recognition of certain ordinary course of business expenses for the year's 2008 and 2009. *As a result, we identified a material weakness in our internal control over financial reporting.* Historically, our accounts payable and accrued expense accounts were evaluated on a quarterly and annual basis based upon whether the corresponding expenses were fairly stated (e.g. by analyzing whether our operating results included twelve months of expenses for the yearly periods or three months of expenses for the quarterly periods) which they did.. However, our procedures did not include a detailed review of ending liability balances for these specific costs and expenses, which resulted in certain expenses being recorded when they were paid rather than incurred. In addition, during the course of their audit, McGladrey identified other adjustments pertaining to the prior years which have also been included in the restatement. Our predecessor auditor concurred with management's assessment and has audited the restatement adjustments.

*On March 28, 2011 management and the Audit Committee reviewed management's findings and the Audit Committee concluded that restating the consolidated financial statements for the years ended December 31,2008 and 2009 is required.* The effects of these restatements are included in this Annual Report on Form 10-K for the fiscal year ended December 31, 2010. The Company has determined that previously reported amounts in our 2010 quarterly filings on Form 10-Q need not be restated due to the immaterial effect on 2010 revenues, operating income, pre-tax income, net income or cash flows for the quarterly periods presented.

The correction of the errors noted in (i) above reduced 2009 and 2008, net income by $606,000 ($.04 per diluted share), $523,000 ($.04 per diluted share), and $628,000 was adjusted to beginning retained earnings as of January 1, 2008.

51.     Accordingly, as a result of Defendants' breaches of fiduciary duties, the Company has been damaged.

**DERIVATIVE AND DEMAND ALLEGATIONS**

52.     Plaintiff brings this action derivatively in the right and for the benefit of Medifast to redress the breaches of fiduciary duty and other violations of law by Defendants.

53.     Plaintiff will adequately and fairly represent the interests of Medifast and its shareholders in enforcing and prosecuting its rights.

- 16 -

54. The Board currently consists of the following fourteen (14) directors: defendants B.T. MacDonald, MacDonald–Sheetz, Reilly, McDevitt, M.C. MacDonald, Lavin, Connolly, Bondroff, Mills, Groves, Maguire, McDaniel, Reece, and Barnum. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

      a. During the Relevant Period, defendants Lavin, Connolly, Bondroff, and Groves served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports and reviewing the integrity of the Company's internal controls. Defendants Lavin, Connolly, Bondroff, and Groves breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures. Therefore, defendants Lavin, Connolly, Bondroff, and Groves each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

      b. The principal professional occupation of defendant B.T. MacDonald is his employment with Medifast as the Chairman of the Board, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. In addition, according to the Company's Proxy Statement filed on August 24, 2010, Defendants have admitted that defendant B.T. MacDonald is not independent. Thus, defendant B.T. MacDonald lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action;

      c. The principal professional occupation of defendant MacDonald-Sheetz is her employment with Medifast as President and COO, pursuant to which she has received and continues to receive substantial monetary compensation and other benefits. In addition, according to the Company's Proxy Statement filed on August 24, 2010, Defendants have admitted that defendant MacDonald-Sheetz is not independent. Thus, defendant MacDonald-Sheetz lacks independence from demonstrably interested directors, rendering her incapable of impartially considering a demand to commence and vigorously prosecute this action;

      d. The principal professional occupation of defendant McDevitt is his employment with Medifast as its CEO, pursuant to which he has received and

continues to receive substantial monetary compensation and other benefits. In addition, according to the Company's Proxy Statement filed on August 24, 2010, Defendants have admitted that defendant McDevitt is not independent. Thus, defendant McDevitt lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action;

e.  Due to their close familial relationships with each other, defendants B.T. MacDonald and MacDonald–Sheetz are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action against each other. In particular, defendants B.T. MacDonald and MacDonald–Sheetz are father and daughter. Thus, defendants B.T. MacDonald and MacDonald–Sheetz lack independence;

f.  Due to their close familial relationships with each other, defendants B.T. MacDonald and M.C. MacDonald are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action against each other. In particular, defendants B.T. MacDonald and M.C. MacDonald are brothers. Thus, defendants B.T. MacDonald and M.C. MacDonald lack independence; and

g.  The members of the Board have clearly demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the Company for the violations of law complained of herein. Most notably, this is evidenced by the Board's initial vague "findings" reached in connection their decision to delay the filing of the Company's 2010 financial results and Annual Report on Form 10-K. Other than the grossest generalities, the findings of the Board were carefully hidden from Medifast stockholders and in such circumstances, Delaware law does not require a stockholder to make a pre-suit demand on a board of directors. Thus, demand is excused.

## COUNT I
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

55.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

56.   As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Medifast disseminated accurate, truthful and complete information to its shareholders.

- 18 -

57.     Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Medifast shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.   These actions could not have been a good faith exercise of prudent business judgment.

58.     As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

59.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

60.     As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

61.     Defendants willfully ignored the obvious and pervasive problems with Medifast's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

62.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

63.     Plaintiff incorporates by reference and realleges each and every allegation

- 19 -

contained above, as though fully set forth herein.

64.    Defendants owed and owe Medifast fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe Medifast the highest obligation of good faith, fair dealing, loyalty and due care.

65.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

66.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Medifast has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

67.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

68.    Plaintiff, on behalf of Medifast, has no adequate remedy at law.

## COUNT IV
## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

69.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

70.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Medifast.

71.    Plaintiff, as a shareholder and representative of Medifast, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT V
## AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

72.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

73.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Medifast, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing Medifast to misrepresent material facts regarding its financial position and business prospects.

74.     As a direct and proximate result of Defendants' abuse of control, Medifast has sustained significant damages.

75.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

76.     Plaintiff, on behalf of Medifast, has no adequate remedy at law.

**COUNT VI**
**AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT**

77.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

78.     Defendants had a duty to Medifast and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Medifast.

79.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Medifast in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Medifast's affairs and in the use and preservation of Medifast's assets.

80.     During the course of the discharge of their duties, Defendants knew or recklessly

disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Medifast to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Medifast, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Medifast.

## COUNT VII
## AGAINST ALL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

81.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

82.    As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Medifast to incur (and Medifast may continue to incur) significant legal liability and/or legal costs to defend itself as a result of Defendants' unlawful actions.

83.    As a result of this waste of corporate assets, Defendants are liable to the Company.

84.    Plaintiff, on behalf of Medifast, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.    Directing Medifast to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be

necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board

C.      Awarding to Medifast restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: April 1, 2011

GOLDMAN & MINTON, P.C.

Thomas J. Minton – No. 03370
20 South Charles Street, Suite 1201
Baltimore, MD 21201
Telephone:  (410) 783-7575
Facsimile:  (410) 783-1711

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
Jeffrey J. Ciarlanto
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone:  (610) 225-2677
Facsimile:  (610) 225-2678

**GOLDFARB BRANHAM LLP**
Hamilton Lindley

Saint Ann Court
2501 N. Harwood St., Suite 1801
Dallas, TX 75201
Telephone:  (214) 583-2233
Facsimile:  (214) 583-2234